**SOUTHWESTERN SETTLEMENT & DEVELOPMENT CORPORATION, et al., Appellants,**

**v.**

**The STATE of Texas, Appellee.**

**No. 5025.**

Court of Civil Appeals of Texas.

Beaumont.

June 23, 1955.

Rehearing Denied Sept. 21, 1955.

Blades, Kennerly & Whitworth, Houston, Ramsey & Ramsey, San Augustine, for appellants.

E. G. Aycock, Ft. Worth, for appellee.

WALKER, Justice.

This suit is for taxes for 1951 and 1952, levied on 46 tracts of land, amounting to approximately 35,000 acres, in San Augustine County. It was brought by the State in its own behalf and in behalf of San Augustine County and 12 common school districts in that county. The defendants were the Southwestern Settlement & Development Corporation, which owns the surface of the land, and three corporations which own the mineral estate therein, namely, Houston Oil Company of Texas, American Republics Corporation, and Republic Production Company. The cause was tried to a jury, which returned a verdict favorable to the plaintiff, and the trial court rendered judgment in plaintiff's behalf against said defendants for taxes, penalties, interest and costs totalling $20,112.22. From this judgment the defendants have appealed.

1. All of the points of error assigned pertain either to special defenses alleged by the defendants or to matters occurring on trial not involving plaintiff's evidence. And, except as the special defenses affect the judgment, the prima facie case for recovery made by the plaintiff is not attacked.

2. It is provided in art. 8, § 1, of the Texas Constitution, Vernon's Ann.St., that "Taxation shall be equal and uniform" and that "property * * * shall be taxed in proportion to its value".

The essence of the special defenses alleged, so far as involved on this appeal, is discrimination against defendants by the Board of Equalization of the County in assessing defendants' property, either specifically or in consequence of arbitrary action. It has not been contended that the assessments of defendants' property exceeded the value of that property, and a comparison of the jury's findings under Issues 15 and 16, fixing the market value of the defendants' property on January 1, 1951, and on January 1, 1952, at $90 and $95 an acre, respectively, with the rate of $12 an acre at which defendants' property was assessed for each tax year in suit shows that assessments did not exceed value. The findings under Issues 15 and 16 are supported by evidence and error has not been assigned to them. The pleas to be considered, with the portions of the charge submitting them, are the following:

The defendants alleged, in substance, that the provisions of art. 8, § 1, just quoted had been violated in both tax years in suit by the Board of Equalization's adoption and use of a plan of assessment under which lands were not assessed according to value but were divided into classes determined by other facts and were then assessed at a certain sum per acre according to the class in which the particular land fell. In consequence, taxation for these years was not equal and uniform and a discrimination against the defendants had resulted which injured them because defendants' lands had been assessed proportionately higher than had lands of others. The plan alleged created two major classes of lands, those in towns and those not, and defendants alleged no plan of assessment concerning urban properties. However, as regards lands outside of towns the plan alleged was: (a) all timber land to be assessed at $12 an acre; (b) all other land on or easily accessible to hard surfaced road or highway to be assessed at $10 an acre; and (c) all land remaining to be assessed at $8 an acre. (d) The value of improvements was to be added in classes (b) and (c). (e) $1 an acre was to be subtracted from these values where the taxpayer did not own the minerals.

This final element is not material here. Defendants alleged further that their lands had been assessed at a uniform rate pursuant to this plan.

This defense was submitted to the jury by Issues 1 to 6, inclusive, and the jury answered all of these issues *No,* thereby refusing to find from a preponderance of the evidence that a plan to assess lands at the several rates alleged by defendants had been adopted by the Board of Equalization for either tax year in suit.

The matter of *arbitrary action* was independently submitted by Issues 11 to 14, inclusive, and the jury answered *No* to the basic ones of these, 11 and 13. Thereby they refused to find from a preponderance of the evidence that the Board of Equalization had arbitrarily fixed the values of defendants' properties for either tax year in suit. *Arbitrary* was defined in part as meaning "without adequate determining principle."

In addition to the charge of assessment according to plan, the defendants alleged that a discrimination was practiced against them by the Board in favor of owners of land in cities and towns and also in favor of owners of timber land, the injury caused being a proportionately higher charge against the defendants.

This defense was submitted to the jury by Issues 7 to 10, inclusive, and to the basic ones, 7 and 9, the jury answered *No.* Thereby they refused to find from a preponderance of the evidence that the Board of Equalization had practiced discrimination against defendants or defendants' properties in fixing the values of these properties for either tax year in suit. *Discrimination* was defined, in part, as meaning that "a higher percentage of the reasonable cash market value of one owner's property is fixed as its value for the purposes of taxation than the percentage of the reasonable cash market value at which other owners' properties are fixed for the purposes of taxation."

The defendants moved for judgment n. o. v. but this motion was denied.

Point 1 assigns as error that the evidence proved as a matter of law the adoption and use by the Board of Equalization of "an arbitrary and unlawful" plan of assessment for each tax year in suit, to the defendants' damage by way of discrimination. The argument made is, in effect, that the element of the plan alleged by defendants which was applicable to timber land was proved as a matter of law. Accordingly, the only question under this point is whether there is anything in evidence to support the verdict of the jury, and we conclude that there is evidence of the following matters.

Four members of the Board of Equalization for 1951 and 1952, the tax years in suit, testified. One, no longer in office, had been county judge, and the other three, still in office, were County Commissioners.

All of these witnesses testified that in 1951, before the Board made any assessments, the members of it took a general view of the County, by driving over and inspecting it, considering the nature of the land and the character of improvements. The former judge said that this required three days, but two of the commissioners said that it took much longer, a week or more.

In 1951, the Board also had available, and they used in determining assessments, a report on valuations of the property in San Augustine Independent School District which had been made for the District. According to the former judge, this school district extended six or eight miles beyond the boundaries of the town and so the report necessarily must have stated valuations of land to which the general plan alleged by defendants applied. The Board refused in many instances to accept the values stated in this report, finding some too high and others too low.

The four members of the Board who testified had some acquaintance with the values of lands from long residence in the county and from their experience in office, and they received information about values of property from various persons including the tax assessor. Testimony of all four of these witnesses shows that in 1951 and again in 1952, the defendants' agent appeared before the Board when the assessments to be made against the defendants were being discussed,

but that the defendants had never furnished the Board with any information about the values of their lands—except as the renditions may have done so. And according to Commissioners Harvey and Fitzgerald, the defendants' agent was requested at these times, both in 1951 and in 1952, to furnish this information, and Commissioner Gardner said that the Board requested this information during the period in suit.

The members of the Board who testified all denied that the plan of assessment charged by the defendants had been adopted by the Board, and all testified that the Board had attempted to determine the values of properties assessed, considering toward that end a number of different facts. The testimony of the three commissioners furnishes no support for the defendants' claim of a plan. Cross examination of the former judge showed that on the trial of a suit for taxes against another concern owning much timber land he had given some testimony which supports defendants' claim of a plan, and which, to some extent at least, he repeated on trial of this cause, but as we have just stated, he also gave testimony to the contrary, and there is some of his evidence which indicates that the elements of the plan charged by defendants really meant to him only preliminary points at which to begin the consideration of values. See S.F. 155–6; 166–9; 178–80. Testimony of Commissioner Gardner given on the same trial (S.F. 452) also indicates that this was done. Concerning the use of a given money value as such a beginning point, see Druesdow v. Baker, Tex.Com.App., 229 S.W. 493, at page 495; Port Arthur Independent School Dist. v. Baumer, Tex.Civ.App., 64 S.W.2d 412, at page 414; Lubbock Hotel Co. v. Lubbock I.S.D., Tex.Civ.App., 85 S.W.2d 776, at page 779.

These witnesses all testified that the Board tried in a general way to make assessments at 35%, or from 30 to 35 percent, of the value of the properties in the county, although there was some testimony that this understanding was not adhered to rigidly. Their opinions regarding the market values of the defendants' properties were plainly inconsistent with this testimony, but this raised questions for the jury.

Evidence pertaining more directly to specific elements of the plan charged by defendants is separately stated and discussed in a paper entitled "supplemental findings". We realize that in this case it was not practicable for the defendants to prove the relevant facts pertaining to every piece, or even to most of the land in the county. The deputy assessor testified that there were many hundreds of properties on the tax rolls for the years in suit and that it was impossible even to make up these rolls in the assessor's office without error. And it is held that such a quantity of evidence is not necessary to make a prima facie case on the issue of inequality of assessment. See Dallas County v. Dallas National Bank, 142 Tex. 439, 179 S.W.2d 288. So what we have to say, in the supplemental findings and in the following discussion of this evidence, has no bearing except on the very contention now made by the defendants, that the use of the plan as regards timber land was proved as a matter of law. On this point the character of the evidence (summarized in the supplemental findings) regarding lands in towns and regarding lands outside of towns which were not timber lands is, in effect, a circumstance which supports the testimony we have summarized showing that no plan disregarding values was used.

However, let us disregard the various denials of a plan and let us also put aside the conclusions regarding town lands and lands outside of towns which were not timber lands, and consider only matters pertaining to timber lands. A summary of the evidence stated in the supplemental findings shows the following: (a) Mr. Coats' opinions of relative values of the timber of different owners, stated in terms of value per acre, showing that the timber of several timber owners, and thus the land itself bearing this timber, was worth much more than that of the defendants, and that defendants' timber, and thus the lands on which this timber stood, was worth more than that of several other owners. Mr. Coats qualified as an expert, and the investiga-

tion on which his opinions were based was made at the instance and by the employment of the County (except in the case of Collins), in October, November and December of 1952. Mr. Coats' opinions cover land of which the acreage and assessment rates were shown and also cover land for which these facts were not shown, the land *valued* by him being, however, much the greater part of the timber land of the county. (b) The assessment at the same rate of most (many thousands of acres) of the timber land in the county, (c) but with variation in the cases of some timber owners, for which there is some valid explanation and reason; (d) the absence of evidence as to the rate of assessment against a material part of the timber land, except as Commissioner Gardner's testimony of a $10 rate, based on an apparently valid reason, against a certain type of timber land may apply.

Are these facts sufficient to prove as a matter of law the adoption and use of a plan for assessing timber land which was not based on values, or the making of arbitrary or discriminatory assessments against defendants? We think not. The assessment of so many thousands of acres of timber land at the same rate, which must vary in value and quality from tract to tract and which, according to the comments at the foot of most of Mr. Coats' reports did vary in many ways, suggests the use of some rule or standard other than the value of the property, but, considered alone, it does not necessarily prove that. For when considered alone, it might well be no more than an average figure, based on the consideration of a wide area and involving the reconciling of differences mentioned, which is actually a reasonable figure; and there is some evidence from Commissioner Harvey (S.F. 428) that an average was taken in the case of defendants' lands. So, to prove that the rate of assessment was not a reasonable and average figure, reference must be made either to that part of the testimony of the former judge supporting the defendants' allegation of a general plan or to Mr. Coats' opinions of value and to his reports. This testimony of the former judge has been contradicted, by affirmative testimony and by

circumstances and it need not be considered further. As regards Mr. Coats' opinions and reports, if these be accepted as true and correct the defendants' lands have been assessed otherwise than according to value and a discrimination has been practiced against them in fact which injured them. But the findings under Issues 15 and 16, fixing the reasonable cash market value per acre of defendants' lands on January 1, 1951, and January 1, 1952, at $90 and $95 per acre, respectively, instead of the $39.25 testified to by Mr. Coats, show that the jury did not accept Mr. Coats' opinions, and they were not required to do so, for several reasons other than the fact that his testimony concerning values was only an opinion. And for the same reasons they were not required to accept the findings made in his reports.

In the first place, Mr. Coats' opinions of value were contradicted; there is evidence to support the findings under Issues 15 and 16 and the defendants do not assign error against those findings. In the second place, Mr. Coats' opinions of value were based on the information on which his reports were based; the reports may be regarded as stating this information. Mr. Coats said once that the findings produced by the method he used to get this information might be wrong by from 10% to 25%, and he did not say whether the error would be an excess or a deficiency. He said another time that the error would average ten percent. The method itself shows that Mr. Coats' findings in his reports were based on a series of opinions. He did not estimate the timber on every tract of the ownerships he reported on. We note that his reports cover about 26,000 acres of land, while assessment lists mentioned in the supplemental findings show more than 125,000 acres. Instead, he selected what he thought to be representative tracts, that is, tracts from which an inference as to the timber on the entire ownership could be made. He made this selection by viewing timber lands and by advice from others, and his process of learning was continuous. He did say that he had tried to go on every tract owned by Temple, Frost, Kirby and the defendants, although as stated, he only estimated timber on selected tracts.

Next, having selected a tract, he did not estimate all of the timber on it; he estimated the timber on only about 20% of it, unless the tract was small and then his estimate extended to a wider area.

■ It seems to us that the evidence at least authorized findings that defendants had failed to prove by a preponderance of the evidence that their property had been assessed according to an arbitrary plan or that it had been assessed arbitrarily, or further, that discrimination had been practiced against them. The findings to Issues 1 to 6, inclusive, and to Issues 7, 9, 11, and 13 were supported by the evidence. It must be said, further, that according to the findings made to Issues 15 and 16, fixing the values per acre of the defendants' land at $90 and $95 on January 1, 1951 and 1952, discrimination has operated in favor of the defendants and to the injury of other timber owners.

■■ Point 6 assigns as error that Issues 7, 9, 11, and 13 of the trial court's charge called for conclusions of law instead of findings of fact. The nature of these special issues has been indicated. The trial court's definitions of *discrimination* and *arbitrary,* the first referred to in Nos. 7 and 9 and the next in Nos. 11 and 13, must be considered to determine the meaning of these special issues, and this shows that these issues submitted questions of fact. For instance, Issue 7, with the definition of *discrimination* as a part of it, inquired, in substance, whether the Board, in 1951, assessed defendants' properties at a higher percentage of the reasonable cash market value of same than that at which the properties of other owners were assessed; and Issue 9 submitted the same question as to 1952. Issue 11, with the definition of *arbitrary* as a part of it, inquired, in substance, although with some indefiniteness, whether the Board, for 1951, fixed the value of defendants' properties without an adequate determining principle, and Issue 13 submitted the same question for 1952. These are all questions of fact. Point 6 is overruled. In Lubbock Hotel Co. v. Lubbock I.S.D., Tex.Civ.App., 85 S.W.2d 776, the Court of Civil Appeals apparently treated a special issue like Nos. 7 and 9 as one of fact, although no definition is mentioned.

Points 4 and 5 assign error to the trial court's refusal to submit certain special issues requested by the defendants. There were 112 of these special issues.

Issues 1 to 96, inclusive (which include those numbered 60A and 60B) inquired as to the reasonable cash market value on January 1, 1951, and January 1, 1952 of 49 tracts of land reported on by Mr. Coats, the ownership of which was divided in severalty among seven owners, including the defendants. Point 4 assigns error to the refusal of these. There are two defendants' requested issues in the transcript numbered 97. That on Tr. 91 was submitted to the jury as Issue 1 of the charge. That on Tr. 92 seems to be one of the twelve refusal of which is complained of by Point 5. Each issue of the twelve, numbered from 97 to 108, inclusive, inquired whether the lands of defendants were assessed in a particular year at a percentage of their reasonable cash market value *higher* than the percentage of reasonable cash market value at which the lands of a named timber owner were assessed. Six of these issues referred to 1951 and the other six, to 1952, and the six owners other than defendants mentioned in these special issues were those named in Issues 1 to 96, inclusive, as owners of the tracts referred to in those issues.

■ All of the special issues we have mentioned were relevant only to the matter of discrimination against defendants, and were properly refused by the trial court because all were evidentiary as regards that matter. If this were not so, it would be impracticable to try the question of discrimination to a jury, in the broad sense in which we have used the word "discrimination" where numerous properties have to be considered.

Defendants' requested issues 109 and 110 are different from those just discussed. No. 109 reads in part: "Do you find—that the lands of defendants were assessed for taxes for—1951 at a percentage of their reasonable cash market value higher than the per-

centage of the reasonable cash market value at which other timber lands in said county generally were—assessed for taxes for such year?" Issue 110 makes the same inquiry regarding 1952.

It is not clear to us that these two special issues were required by the evidence. Submission of those issues (putting aside all other considerations) would require evidence that the timber land belonging to others than defendants were generally assessed at (or at least near) a certain percentage of value, and the evidence in defendants' behalf tends rather to show the use of fixed rates which disregarded values wholly and so produced unequal assessments. However, regardless of this and other criticisms of these issues by plaintiff requested issues 109 and 110 were properly refused for the following reasons:

 In the first place, the subject matter of these issues was included in that of trial court's issues 7 and 9, respectively, the definition of *discrimination* being considered a part of the latter two, and while trial court's issues 7 and 9 were broader and more indefinite than defendants' requested issues 109 and 110, the defendants assert no objection to trial court's issues 7 and 9 on that ground. In such a case, it is held that an objection to the issue submitted is necessary to establish reversible error, and that the request of a special issue, even one in correct form, is not a substitute for the objection not made. See McDonald's Texas Civil Practice, p. 1136 (Sec. 12.26); City of Dallas v. Priolo, 150 Tex. 423, 242 S.W.2d 176, at page 179; City of Denton v. Hunt, Tex. Civ.App., 235 S.W.2d 212, at page 214; and the decisions cited in these authorities; and also see International-Great Northern R. Co. v. Acker, Tex.Civ.App., 128 S.W.2d 506, at page 522.

 In the second place, requested issues 109 and 110 inquire as to excessiveness of levy, rather than as to inequality of levy, and so viewed were not a complete submission of the defense involved and thus were not a complete request for issues submitting that defense. It is apparent from the evidence that the assessments for 1951 and 1952

have been carried into effect generally, and under favorable answers to requested issues 109 and 110 as we are now construing them, the defendants could have defeated recovery of taxes only to the extent that the taxes levied against them were excessive. And the burden was on them to show, not only the existence of the excess but also the extent of this excess. City of Arlington v. Canon, Tex., 271 S.W.2d 414, at page 417. Defendants, then, had to request appropriate issues which would establish the extent of the excess, but it does not appear that such were requested, and none were in fact submitted. So, if this interpretation of requested Issues 109 and 110 is right, no judgment could have been based on answers to those issues favorable to defendants had those issues been submitted. The refusal of said issues was not error under these circumstances. See McDonald's Texas Civil Practice, p. 1153 (Sec. 12.33); Pacific Employers' Ins. Co. v. Brasher, Tex.Civ.App., 234 S.W.2d 698; Crain v. West Texas Utilities Co., Tex.Civ.App., 218 S.W.2d 512; Warren v. Premier Oil Refining Co., Tex.Civ.App., 173 S.W.2d 287, at pages 293–294; 41 Tex. Jur. 1050 (Sec. 245); 41B Tex.Jur. 534 (Sec. 422).

Points 4 and 5 are overruled.

Point 2 assigns error to the exclusion of certain tables of figures in writing, made by the witness Reed based on these elements: (a) Mr. Coats' estimates of the quantity of timber, pine and hardwood, on the tracts reported on by him to the County in the latter part of 1952 and on the tract reported on by him to the defendants in 1953; (b) the testimony of Mr. Reed as to the average rates at which the board foot quantity of a forest, (we infer that this is the commercially usable part of the timber), pine and hardwood, increased annually through growth, and (c) Mr. Reed's testimony as to the market value of timber on January 1, 1951, and January 1, 1952. Mr. Reed prepared a table for each ownership reported on by Mr. Coats, and each table purported to show how much of the quantity of timber which Mr. Coats estimated to be in existence in the latter part of 1952 was in existence on January 1, 1951, and January 1, 1952, on each tract (of said

ownership) reported on by Mr. Coats. Each table also purported to show the dollar values of the timber on each tract as of January 1, 1951 and 1952, and also stated the totals of these quantities of timber and of these values.

These tables were mathematical calculations, and all of the facts on which they were based were in evidence. Mr. Reed was not shown to be specially qualified to make these computations, but his testimony was not objected to for that reason, and the accuracy of his calculations has not been questioned.

■ Mr. Reed's tables were not rightly excluded because they were only mathematical computations. These tables refer to many tracts and involve many calculations, and without a summary thereof the quantity of information on which these tables were based probably could not have been effectively used by the jury. And it will not be convenient to test the completeness and accuracy of such tables as these unless they are offered during the taking of testimony.

The rule of decision concerning the use of such summaries as these tables were, has been stated as follows in Boston & Worcester Railroad Corporation v. Dana, 1 Gray, Mass., 83, at page 104: "The defendant further objects, that schedules, made from the original papers and documents previously proved in the case, showing certain data and results obtained therefrom, and verified by the witness by whom they were prepared, were improperly admitted. But it appears to us, that questions of this sort must necessarily be left very much to the discretion of the judge who presides at the trial. It would doubtless be inexpedient in most cases to permit ex parte statements of facts or figures to be prepared and submitted to the jury. It should only be done where books and documents are multifarious and voluminous, and of a character to render it difficult for the jury to comprehend material facts without the aid of such statements, and even in such cases, they should not be admitted unless verified by persons who have prepared them from the originals in proof, and who testify to their accuracy, and after ample time has been given to the adverse party to examine them and test their correctness. Such was the course pursued in the present case, and there can be no doubt that, in a trial embracing so many details and occupying so great a length of time as the case at bar, during which a great mass of books and documents were put in evidence, it was the only mode of attaining an intelligent view of the cause before the jury." Also see Evidence, ⊂508, in West's Decennial Digests and see: Wigmore on Evidence, Sec. 1230; Jones's Commentaries on Evidence, Sec. 206; 32 C.J.S., Evidence, § 698, p. 592, § 789, p. 714; 17 Tex.Jur. 509 (Sec. 202), p. 755 (Sec. 329).

■ We hold, however, that the exclusion of Mr. Reed's tables did the defendants no harm. For contrasting a tract with others, or an ownership with others, in a general way, the reports themselves and Mr. Coats himself, on the stand, were available. The summaries which Mr. Reed's tables were would have given the jury some assistance toward this end, but they were not of vital importance. The only other function which these tables could have performed was to serve as a basis for calculation of values per acre, which could then have been contrasted, or as information for consideration by an expert witness. And as for relative values per acre, Mr. Coats gave evidence of these and it does not appear that Mr. Reed or other witnesses were precluded from giving similar evidence, or evidence concerning relative values determined in some other way. That is, the exclusion of these tables did not deprive the defendants of the ultimate testimony on which their defense depended.

Point 2 is overruled.

Point 3 assigns error to the exclusion of mathematical calculations of the average quantity of timber per acre on the tracts reported on by Mr. Coats, based on figures stated in Mr. Coats' reports, which were testified to by the witness Williams. It may be overruled, as showing nothing harmful to defendants, or for the same reasons for which Point 2 was overruled.

Points 7 and 8 have been considered and are overruled. The argument to which Point 8 assigns error was what the courts sometimes refer to as an appeal to passion and prejudice, but the facts stated were prominently in evidence and considering the record as a whole, the error seems harmless.

The judgment of the trial court is affirmed.